MICHAEL LEHNERS, ESQ.      *Ex 9-4-14*
429 Marsh Ave.
Reno, Nevada 89509
Nevada Bar Number 003331
(775) 786-1695
email michaellehners@yahoo.com
Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

oOo

IN RE

SPEED TECHNOLOGIES, LLC,

Debtor(s).

_____/

BK-N- 14-51413-btb
CHAPTER 11
Hearing Date: OST Requested
and Time:_____
Mtn No. _____
Est Time: 25 Minutes
MOTION TO COMPEL TURNOVER OF
ESTATE PROPERTY

COMES NOW Debtor above named by and through undersigned counsel and files the following Motion to Compel Bianchi Estates, LLC to turnover property of the bankruptcy estate pursuant to 11 U.S.C. §542. This motion is made pursuant to the Debtor's offer of adequate protection as well as the pleadings on file herein and the Memorandum of Points and Authorities attached hereto.

### MEMORANDUM OF POINTS AND AUTHORITIES

**1. Relief Requested**

This motion seeks the return of over one million dollars of parts, vehicles and equipment that is in the possession of the Debtor's former landlord, Bianchi Estates, LLC. While the Debtor does not believe Bianchi Estates has any in rem claim against the Debtor's property, it is still willing to tender adequate protection as a condition of receiving

1

turnover of the property. Specifically, the Debtor shall pay to the Trust account of Bianchi Estates' counsel the sum of $831.25 which represents interest at 5.25% on the disputed amount of $190,321.64. In addition, once the Debtor is allowed access to its former premises, it will pay pro-rated rent while it removes its machinery and equipment.

## 2.    Background

Speed Technologies is a Limited Liability Company. John A. Harrah is the Manager. The Harrah Family Trust U/A/D 12/27/90 is the Managing Member. The Debtor is engaged in the business of off road racing. It owns superlight race trucks. These vehicles compete in closed track racing, such as the kind sponsored by the Lucas Oil Series[1].

Speed Technologies offers the public both the opportunity to participate in a hands on school under the close supervision of professional instructors, it also has a chance to actually race these highly specialized trucks on professionally designed courses. Speed Technologies is a self contained company. That is to say it builds and maintains these race trucks in house. The trucks are routinely torn down and inspected after every school and after every race. Safety is the prime concern of Speed Technologies.

On May 25, 2010 Speed Technologies signed a lease with Bianchi Estates for the premises located at 9716 South Virginia Street. The lease is for a 12,507 square foot industrial facility. On April 17, 2013 the parties executed an amendment to the lease that set the rent at $10,816.00 from July 1 of 2013 through June of 2014. A true and correct copy of this lease has been attached hereto as Exhibit "1". Paragraph

---

[1] If a picture is worth a thousand words, then a website is worth more. For a better description of this kind of racing, please go to http:/www.lucasoiloffroad.com.

2

13.4 imposes a late charge of 10% of the payment as a "one time" late charge.

On May 14, 2014 Bianchi Estates executed an Affidavit of Non-Payment in the Reno Justice Court. This was filed on May 27, 2014. The Affidavit shows that the date of delinquency was May 5, 2014; however Bianchi did not impress a 10% late charge that would be $1,018.60. Instead, Bianchi imposed a late charge of $5,428.00[1], which is more than five times the amount allowed under the Lease[2]. A copy of this Affidavit has been attached hereto as Exhibit "2".

On May 27, 2014 Bianchi Estates obtained a lock out order and changed the locks on the premises so Speed Technologies' could not remove its property. A copy of this Lock Out Order has been attached hereto as Exhibit "3".

Filed concurrently with this motion is the Affidavit of John Bush. Mr. Bush is the general manager of Speed Technologies, LLC. Mr. Bush's affidavit sets forth the following facts:

1.    After locking out Speed Technologies from the premises, Bianchi refused, despite repeated requests, to allow Speed Technologies to remove any of its property from the leased premises.

2.    Bianchi called Cal-Nevada Towing, and it had Speed Technologies' vehicles and trailers towed to a tow yard located at 1408 Pittman Avenue, Reno, Nevada.

3.    Mr. King is the owner of Cal-Nevada Towing, and Mr. Bush is a longtime acquaintance of Mr. King.

---

[1] This was calculated as the $16,224.00 set forth in the lock out order less the rent specified by the Lease.
[2] Notwithstanding the "one time" late charge language in paragraph 13.4 of the lease, Bianchi assessed retroactive late charges for each month the rent was not paid on time. Please see Exhibit "4".

3

4.   Mr. King has sent Speed Technologies, LLC, a notice that he intends to conduct a sale of Speed Technologies, LLC's property described above on Saturday, September 6, 2014, at 1408 Pittman Avenue, Reno, Nevada. Please see Exhibit "2" to Mr. Bush's affidavit.

5.   Mr. King told Mr. Bush that Cal-Nevada Towing took the vehicles described in his affidavit at the request and instruction of Ms. Bianchi.

The affidavit Bianchi Estates filed in Justice Court shows that the date of delinquency was May 5, 2014. The attached lease shows the rent is $10,816.00 per month, and that there is a "one time" late charge of 10%. As of May 27, 2014 Bianchi claimed $16,224.00. This amount exploded into a $190,321.64 demand as of August 10, 2014. An itemization of Bianchi Estates' costs has been attached hereto as Exhibit "4".

The lease allows the reasonable costs of reletting the premises. The amounts charged by Bianchi are patently unreasonable. The following is an itemization for the more unreasonable charges:

1.   June through October of 2014 rent of $56,016.00 when the lease expired on June 30, 2014[1], and when entry on the premises was refused.

2.   Payment of legal fees of $54,333.20 when Bianchi had the option to allow the property removal and sue for actual damages.

3.   Payment of $35,657.50 to Cal-Nevada Towing to remove vehicles and trailers Speed Technologies requested that it be allowed to remove.

4.   Payment of $14,256.00 in consultant services[2].

---

[1] Please see Addendum No. 1 to lease.

[2] This is perhaps one of the more egregious charges. Bianchi Estates, LLC is owned by Lucienne Bianchi, yet she paid herself $6,850.00 to consult with her own LLC.

4

To summarize, Speed Technologies was evicted for failing to pay the May rent. Bianchi was entitled to go to Justice Court and obtain a lockout order. However, she was not entitled to hold the Debtor's property hostage for the payment of unreasonable expenses. She has no lien on the property. She is an unsecured creditor holding property of the estate hostage.

### 3.    Third Party Property

Not only is Bianchi Estates holding the Debtor's property. She is also holding property that belongs to Speed Technologies' customers. Attached as Exhibit "5" is a list of the property, names and phone numbers of the known third party claimants that have contacted undersigned counsel. On behalf of these parties the Debtor is also requesting the return of these items to the third parties.

### 4.    Analysis

11 U.S.C. §542(a) states:

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

The duties under 11 U.S.C. §542(a) are absolute and unconditional. The duties are not contingent upon a request by the trustee, or upon any resolution of any exemption issue, or upon the issuance of a turnover order by the Court, or upon any other condition precedent. The duty is absolute. In re Bidlofsky, 57 B.R. 883, (Bkrtcy. E.D. Mich. 1985), citing United States v. Whiting Pools, Inc., 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

5

**5.    Debtor's   Offer   of   Adequate   Protection**

It is the Debtor's position that Bianchi Estates is not a secured creditor, nor can it claim any lien in the Debtor's property it is holding. Notwithstanding this position, the Debtor understands that resolution of this issue must be by this Court. In addition, the Debtor estimates it will take up to thirty days to remove the equipment from the premises due to the size and complexity of the equipment on site.

As adequate protection, the Debtor offers to pay into Bianchi Counsel's trust account the sum of $831.25 which is monthly interest on the $190,321.64 at 5.25%. In addition, it will pay pro-rated rent from the time it is granted access to the premises until the time the equipment is moved.

**6.    Conclusion**

The Debtor has the powers of a Trustee under 11 U.S.C. §1107. This includes the power to seek turnover of its property. Bianchi Estates not only has no lien on the property; it also has added tens of thousands of dollars in improper charges. In light of the foregoing, the Debtor respectfully requests that the Court grant its motion.

Dated: This ___3___ day of ___September___, 2014

By: _____
     Michael Lehners, Esq.
     429 Marsh Ave.
     Reno, Nevada 89509
     Nevada Bar Number 003331

6

# Exhibit  1

# Exhibit  1



# AIR COMMERCIAL REAL ESTATE ASSOCIATION
## STANDARD INDUSTRIAL/COMMERCIAL
## MULTI-TENANT LEASE - GROSS

1.  **Basic Provisions ("Basic Provisions").**
    1.1  **Parties:** This Lease ("Lease"), dated for reference purposes only May 25, 2010
is made by and between Bianchi Estates, LLC

_____ ("Lessor")

and Speed Technologies, LLC (a Delaware Limited Liability Company)

_____

_____ ("Lessee"), (collectively the "Parties", or individually a "Party").
    1.2(a)  **Premises:** That certain portion of the Project (as defined below), including all improvements therein or to be provided by Lessor
under the terms of this Lease, commonly known by the street address of 9716 South Virginia Street, Suite 100
located in the City of Reno                                          , County of Washoe
State of Nevada                          , with zip code 89511          , as outlined on Exhibit N/A          attached
hereto ("Premises") and generally described as (describe briefly the nature of the Premises) 12,507 square foot industrial flex
facility, including 1,456 square feet of office, with non-exclusive use of 12,000+/-
square foot yard.
In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to any utility raceways of
the building containing the Premises ("Building")and to the Common Areas (as defined in Paragraph 2.7 below) but shall not have any rights to the
roof, or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they
are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project" (See also Paragraph 2)
    1.2(b)  **Parking:** as per CC&Rs                               unreserved vehicle parking spaces (See also Paragraph 2.6)
    1.3  **Term:** 2          years and 0          months ("Original Term") commencing July 1, 2010
("Commencement Date") and ending June 30, 2012                                          ("Expiration Date"). (See also Paragraph 3)
    1.4  **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
N/A                          ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)
    1.5  **Base Rent:** $ 10,000.00          per month ("Base Rent"), payable on the 1st
day of each month commencing August 1, 2010                                          (See also Paragraph 4)
☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph ~~52~~ 52 ~~aa~~
    1.6  **Lessee's Share of Common Area Operating Expenses** 0          percent (0          %) ("Lessee's Share")
In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to
reflect such modification.
    1.7  **Base Rent and Other Monies Paid Upon Execution:**
         (a)  **Base Rent:** $ 10,000.00          for the period July 1 - July 31, 2010
         (b)  **Common Area Operating Expenses** $          0.00          for the period N/A
         (c)  **Security Deposit:** $ 650.00          ("Security Deposit") (See also Paragraph 5) ("$9,750 on file").
         (d)  **Other:** $ 0.00          for N/A
         (e)  **Total Due Upon Execution of this Lease:** $ 10,650.00
    1.8  **Agreed Use:** General office and warehouse use for the business of off road racing
and engine manufacturing; indoor manufacturing, processing, assembly and fabrications and
other related uses.
_____ (See also Paragraph 6)
    1.9  **Insuring Party.** Lessor is the "Insuring Party". (See also Paragraph 8)
    1.10  **Real Estate Brokers:** (See also Paragraph 15)
         (a)  **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check
applicable boxes):
☑ Daniel Buhrmann, CB Richard Ellis, Inc.                      represents Lessor exclusively ("Lessor's Broker"); or
☑ John Walker, Stark and Associates                          represents Lessee exclusively ("Lessee's Broker"); or
☐                                          represents both Lessor and Lessee ("Dual Agency").
         (b)  **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers for the
brokerage services rendered by the Brokers the fee agreed to in the attached separate written agreement or if no such agreement is attached, the sum
of N/A          or N/A          % of the total Base Rent payable for the Original Term, the sum of N/A          or N/A          of the total
Base Rent payable during any period of time that the Lessee occupies the Premises subsequent to the Original Term, and/or the sum of
N/A          or N/A          % of the purchase price in the event that the Lessee or anyone affiliated with Lessee acquires from Lessor any
rights to the Premises
    1.11  **Guarantor:** The obligations of the Lessee under this Lease are to be guaranteed by None.
_____ ("Guarantor"). (See also Paragraph 37)
    1.12  **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑ an Addendum consisting of Paragraphs ~~50~~ 50          through ~~63~~ 63

PAGE 1 OF 17

INITIALS ____          INITIALS ____

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                          FORM MTG-10-01/10E

☐ a site plan depicting the Premises;
☐ a site plan depicting the Project;
☐ a current set of the Rules and Regulations for the Project;
☐ a current set of the Rules and Regulations adopted by the owners' association;
☐ a Work Letter;
☐ other (specify): _____

_____

_____

2    **Premises.**

2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different.  NOTE: Lessee is advised to verify the actual size prior to executing this Lease.

2.2    **Condition.** Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls - see Paragraph 7).

2.3    **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes that were in effect at the time that each such improvement, or portion thereof, was constructed, and also with all applicable laws, covenants or restrictions of record, regulations, and ordinances in effect on the Start Date ("Applicable Requirements"). Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)    Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor elects does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4    **Acknowledgements.** Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to


INITIALS

PAGE 2 OF 17

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTG-10-01/10E

investigate the financial capability and/or suitability of all proposed tenants.

2.5    Lessee as Prior Owner/Occupant.  The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises  In such event, Lessee shall be responsible for any necessary corrective work.

2.6    Vehicle Parking.  Lessee shall be entitled to use the number of Parking Spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking.  Lessee shall not use more parking spaces than said number.  Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "Permitted Size Vehicles."  Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9.  No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor.  In addition:

(a)    Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

(b)    Lessee shall not service or store any vehicles in the Common Areas.

(c)    If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.7    Common Areas - Definition  The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8    Common Areas - Lessee's Rights.  Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project.  Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas.  Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9    Common Areas - Rules and Regulations.  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("Rules and Regulations") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees.  Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform.  Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

2.10    Common Areas - Changes.  Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)    To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)    To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)    To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)    To add additional buildings and improvements to the Common Areas;

(e)    To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)    To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

3.    Term.

3.1    Term.  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3

3.2    Early Possession.  Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession.  All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.3    Delay in Possession.  Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date.  If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date.  Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of the delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed, but minus any days of delay caused by the acts or omissions of Lessee.  If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder.  If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate.  Except as otherwise provided, if possession is not tendered to Lessee by the Commencement Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee.  If possession of the Premises is not delivered within 4 months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4    Lessee Compliance.  Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5).  Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance  Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied

INITIALS

PAGE 3 OF 17

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTG-10-01/10E

4.    **Rent.**

    4.1.    **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

    ~~4.2    Common Area Operating Expenses". Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:~~

        ~~(a)    The following costs relating to the ownership and operation of the Project are defined as "Common Area Operating Expenses":~~

        ~~(i)    Costs relating to the operation, repair and maintenance, in neat, clean, good order and condition, but not the replacement (see subparagraph (e)), of the following:~~

        ~~(aa)    The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.~~

        ~~(bb)    Exterior signs and any tenant directories.~~

        ~~(cc)    Any fire sprinkler systems.~~

        ~~(dd)    All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.~~

        ~~(ii)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.~~

        ~~(iii)    The cost of trash disposal, pest control services, property management, security services, owner's association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.~~

        ~~(iv)    Reserves set aside for maintenance and repair of Common Areas and Common Area equipment.~~

        ~~(v)    Any increase above the Base Real Property Taxes (as defined in Paragraph 10).~~

        ~~(vi)    Any "Insurance Cost Increase" (as defined in Paragraph 8).~~

        ~~(vii)    Any deductible portion of an insured loss concerning the Building or the Common Areas.~~

        ~~(viii)    Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.~~

        ~~(ix)    The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided, however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.~~

        ~~(x)    The cost of any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.~~

        ~~(b)    Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building or other building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.~~

        ~~(c)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.~~

        ~~(d)    Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year. If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.~~

        ~~(e)    Common Area Operating Expenses shall not include the cost of replacing equipment or capital components such as the roof, foundations, exterior walls or Common Area capital improvements, such as the parking lot paving, elevators, fences that have a useful life for accounting purposes of 5 years or more.~~

        ~~(f)    Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.~~

    4.3    **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any statement or invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

5.    **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTG-10-01/10E

general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.    **Use.**

6.1    **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the Building or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Project. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2    **Hazardous Substances.**

(a)    **Reportable Uses Require Consent.** The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)    **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)    **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)    **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)    **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which suffered as a direct result of Hazardous Substances on the Premises prior to Lessee taking possession or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)    **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee taking possession, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)    **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

INITIALS                                                                                 INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                     FORM MTG-10-01/10E

6.3    **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to such Requirements, without regard to whether said Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of written request therefor.

7.    **Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1    **Lessee's Obligations.**

(a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler and pressure vessels, and (iii) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c) **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d) **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time.

7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Lessee expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    **Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions.** The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease (as extended) does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS                                                                                                              INITIALS

FORM MTG-10-01/10E

amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) Liens; Bonds. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4    Ownership; Removal; Surrender; and Restoration.

(a) Ownership. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) Surrender; Restoration. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowances for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) even if such removal would require Lessee to perform or pay for work that exceeds statutory requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.    Insurance; Indemnity.

8.1    Payment of Premium Increases.

(a)    As used herein, the term "Insurance Cost Increase" is defined as any increase in the actual cost of the insurance applicable to the Building and/or the Project and required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), ("Required Insurance"), over and above the Base Premium, as hereinafter defined, calculated on an annual basis. Insurance Cost Increase shall, however, not be limited to, requirements of the holder of a mortgage or deed of trust covering the Premises, Building and/or Project, increased valuation of the Premises, Building and/or Project, and/or a general premium rate increase. The term Insurance Cost Increase shall not, however, include any premium increases resulting from the nature of the occupancy of any other tenant of the Building. The "Base Premium" shall be the annual premium applicable to the 12 month period immediately preceding the Start Date. If, however, the Project was not insured for the entirety of such 12 month period, then the Base Premium shall be the lowest annual premium reasonably obtainable for the Required Insurance as of the Start Date, assuming the most nominal use possible of the Building. In no event, however, shall Lessee be responsible for any portion of the premium cost attributable to liability insurance coverage in excess of $2,000,000 procured under Paragraph 8.2(b).

(b)    Lessee shall pay any Insurance Cost Increase to Lessor pursuant to Paragraph 4.2. Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2    Liability Insurance.

(a) Carried by Lessee. Lessee shall obtain and keep in force a Commercial General Liability policy of Insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) Carried by Lessor. Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3    Property Insurance - Building, Improvements and Rental Value.

(a) Building and Improvements. Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

(b) Rental Value. Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor



INITIALS

PAGE 7 OF 17

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTG-10-01/10E

and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c) Adjacent Premises. Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d) Lessee's Improvements. Since Lessor is the insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4    Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.

(a) Property Damage. Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations or, at Lessee's option shall provide Lessor with written evidence that such insurance is in force.

(b) Business Interruption. Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) Worker's Compensation Insurance. Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements.

(d) No Representation of Adequate Coverage. Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5    Insurance Policies. Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    Waiver of Subrogation. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    Indemnity. Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8    Exemption of Lessor and its Agents from Liability. Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9    Failure to Provide Insurance. Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.    Damage or Destruction.

9.1    Definitions.

(a) "Premises Partial Damage" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total. Notwithstanding the foregoing, Premises Partial Damage shall not include damage to windows, doors, and/or other similar items which Lessee has the responsibility to repair or replace pursuant to the provisions of Paragraph 7.1.

(b) "Premises Total Destruction" shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) "Insured Loss" shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

©1998 · AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTG-10-01/10E

(d) "Replacement Cost" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) "Hazardous Substance Condition" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2    **Partial Damage - Insured Loss.**  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to:  (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    **Partial Damage - Uninsured Loss.**  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    **Total Destruction.**  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    **Damage Near End of Term.**  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.**  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.**  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    **Termination; Advance Payments.**  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.    **Real Property Taxes.**

10.1    **Definitions.**

(a) "Real Property Taxes."  As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Project is located.  The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

(b) "Base Real Property Taxes."  As used herein, the term "Base Real Property Taxes" shall be the amount of Real Property Taxes, which are assessed against the Premises, Building, Project or Common Areas in the calendar year during which the Lease is executed.  In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real

INITIALS

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION    FORM MTG-10-01/10E

Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2    Payment of Taxes.    Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3    Additional Improvements.    Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other tenants or by Lessor for the exclusive enjoyment of such other Tenants. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4    Joint Assessment.    If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5    Personal Property Taxes.    Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    Utilities and Services.    Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs. There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    Assignment and Subletting.

12.1    Lessor's Consent Required.

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    Terms and Conditions Applicable to Assignment and Subletting.

(a) Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the

PAGE 10 OF 17

INITIALS

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTG-10-01/10E

original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3    **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations under this Lease, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease, provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.    **Default; Breach; Remedies.**

13.1    **Default; Breach.** A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)    The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)    The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)    The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d)    The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material data safety sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)    A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)    The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)    The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)    If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    **Remedies.** If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but

INITIALS                                                          INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM MTG-10-01/10E

not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    Inducement Recapture. Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges. Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest. Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to scheduled payments (such as Base Rent) or within 30 days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the 31st day after it was due as to non-scheduled payments. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessor.

(a) Notice of Breach. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor. In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation. If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the floor area of the Unit, or more than 25% of the parking spaces is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall have the right to remove and/or be compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    Brokerage Fees.

15.1    Additional Commission. If a separate brokerage fee agreement is attached then in addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule attached to such brokerage fee agreement.

INITIALS

INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

15.2    **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3    **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.    **Estoppel Certificates.**

(a) Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Less or is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice deliver such Lessor to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    **Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.    **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    **Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.    **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.    **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.    **Notices.**

23.1    **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2    **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.    **Waivers.**

(a)    No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)    The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)    THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED

INITIALS                                                                                                    INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                FORM MTG-10-01/10E

THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.   Disclosures Regarding The Nature of a Real Estate Agency Relationship.

(a)    When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)    _Lessor's Agent_.  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations:  _To the Lessor_:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  _To the Lessee and the Lessor_:  a. Diligent exercise of reasonable skills and care in performance of the agent's duties.  b. A duty of honest and fair dealing and good faith.  c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)    _Lessee's Agent_.  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  _To the Lessee_:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  _To the Lessee and the Lessor_:  a. Diligent exercise of reasonable skills and care in performance of the agent's duties.  b. A duty of honest and fair dealing and good faith.  c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)    _Agent Representing Both Lessor and Lessee_.  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee:  a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b)    Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)    Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.   No Right To Holdover.  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.   Cumulative Remedies.  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.   Covenants and Conditions; Construction of Agreement  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.   Binding Effect; Choice of Law.  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.   Subordination; Attornment; Non-Disturbance.

30.1    Subordination.  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    Attornment.  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    Non-Disturbance.  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4    Self-Executing.  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and

Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32    **Lessor's Access; Showing Premises; Repairs.** Showing Premises; Repairs. Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.    **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.    **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.    **Guarantor.**

37.1    **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association.

37.2    **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.    **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.    **Options.** If Lessee is granted an option, as defined below, then the following provisions shall apply.

39.1    **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor, (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2    **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3    **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4    **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until the said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.    **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

41.    **Reservations.** Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee.

INITIALS                                                                                                      INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                                           FORM MTG-10-01/10E

Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42.    **Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not institute suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

43.    **Authority; Multiple Parties; Execution.**

(a) If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b) If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c) This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Instrument.

44.    **Conflict.**  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

45.    **Offer.**  Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

46.    **Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.  As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

47.    **Waiver of Jury Trial.**  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

48.    **Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not  attached to this Lease.

49.    **Americans with Disabilities Act.**  Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM A ID PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:

1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: _Roseville, CA._  
On: _7/6/10_  

Executed  
On: _June 18, 2010_

**By LESSOR:**  
Bianchi Estates, LLC

By: _[signature]_  
Name Printed: Mr. Paul Bianchi, Jr.  
Title: Principal

By: _____  
Name Printed: _____  
Title: _____

Address: P.O. Box 2455  
Rocklin, CA 95677

Telephone: (916) 767-0605

**By LESSEE:**  
_Speed Technologies LLC_

By: _[signature]_  
Name Printed: _Chitterral_  
Title: _Owner_

By: _____  
Name Printed: _____  
Title: _____

Address: _____  
_____

Telephone: (___) _____

_[initials]_  
INITIALS

PAGE 16 OF 17

_[initials]_  
INITIALS

©1998 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM MTG-10-01/10E

| | |
|---|---|
| Facsimile:(916) 797-1742 | Facsimile:(___) |
| Federal ID No. 20-8949399 | Federal ID No. |
| **BROKER:** | **BROKER:** |
| Mr. Daniel Buhrmann | Mr. John Walker |
| | |
| Att: | Att: |
| Title: Vice President | Title: |
| Address: 6980 Sierra Center Parkway, Suite 160 | Address: 9655 Double R Blvd. |
| Telephone:(775) 823-6929 | Telephone:(775) 825-4400 |
| Facsimile:(775) 356-6181 | Facsimile:(___) |
| Federal ID No. | Federal ID No. |
| Broker/Agent DRE License #: | Broker/Agent DRE License #: |

**NOTICE:** These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.

(c)Copyright 1998 By AIR Commercial Real Estate Association.
All rights reserved.
No part of these works may be reproduced in any form without permission in writing.

ADDENDUM TO THAT CERTAIN LEASE DATED JULY 1, 2010
BY AND BETWEEN
BIANCHI ESTATES LLC,"LESSOR"
AND
SPEED TECHNOLOGIES LLC,"LESSEE"

50. <u>Non-Sufficient Funds Check</u>:
In the event Lessor receives a Non-Sufficient Funds (NSF) check, Lessor may request all future payment to be paid by Cashier's Check only. Additionally, there shall be a $25.00 NSF check handling fee.

51. <u>Application of Late Payment</u>:
In the event Lessee is late on any monthly rental payments, Lessor shall apply any monies received by Lessee first to any legal fees, court costs, late charges, etc. The balance of said funds shall be applied to rent.

52. <u>Signage</u>:
Lessee is responsible for adhering to the existing and any future sign ordinances pertaining to the city of Reno. Lessee agrees that prior to installing any signs, Lessee will obtain the necessary permits and approval from the appropriate governmental bodies. Any signage that is put up shall be subject to Lessor's prior written approval.

53. <u>Alterations</u>:
Lessee shall have the right, inside the Premises, with Lessor's consent, but at its own cost and expense and in good workmanlike manner, to make alterations, additions or improvements as required by Lessee's intended use, or erect, remove or alter partitions, or erect shelves, bins, machinery, ventilation and trade fixtures as it may deem advisable and mark, paint into any surface, bore, cut string wires, lay floor coverings and install locks or bolts, provided; (i) such acts do not adversely affect the right of other Tenants; (ii) Lessee restores the Premises to its prior condition (reasonable wear and tear expected) at the end of this Lease; (iii) Lessee complies with all applicable laws and government rules and regulations; and (iv) gives Lessor prior written notice of any proposed changes.

54. <u>Use Restrictions</u>:
Lessee agrees to store any and all materials and vehicles within the Premises and fenced yard area. Outside storage is strictly prohibited except within fenced yard area. Lessee shall have the right to maintain and use the yard area for all parking and storage of vehicles and materials, on an exclusive basis throughout the Lease term. Should this restriction be violated, Lessor shall notice Lessee in writing, via Priority Mail to the notice address per item 23.1 of lease, allowing 5 calendar days from the date of mailing to cure the violation. Should violation not be cured within 5 calendar days, it will be considered a break of this Lease and at Lessor's option, the Lease may be terminated. Violations of a similar nature occurring over the remainder of the lease term shall be considered a continuing violation and the Lessor's right to terminate the lease shall be maintained. Lessee shall be responsible for any and all violation fines assessed by Foothill Commerce Center Maintenance Association to Lessor. In addition, Lessor at Lessor's discretion may tow away any vehicles outside the Lease premises and bill Lessee for cost of towing and storage.

55. <u>Occupancy Type</u>:
Should any governmental authority require any additional improvements, modifications, licenses and/or permits of any kind, including but not limited to, a conditional use permit due to Lessee's use and/or occupancy of the premises, it shall be provided by Lessee, at Lessee's sole expense. It is Lessor's understanding that in the event Lessee uses hazardous materials in

his operation on the Premises which would cause Lessee's occupancy to be considered anything other than a B-1 or B-2 type occupant, such as an H occupancy type for example; which requires any additional improvements to the space (i.e.,additional fire sprinkler drops, ventilation equipment and/or ducting additional sheetrock, and etc.) then Lessee shall provide same as his sole cost and expense.

### 56. Roof/Building Penetrations:

Under no circumstances shall the Lessee, his agents or employees penetrate the roof/building of the Premises. In the event the Lessor discovers that the Lessee has penetrated the roof/building the Lessor shall have the right, without further notice to the Lessee, to undertake any repairs deemed reasonable necessary in the opinion of the Lessor. Lessee shall immediately reimburse Lessor for all expenses so incurred, plus fifteen percent (15%) for the Lessor's administrative expenses related hereto. All monies due Lessor under this section shall be considered as additional rent as defined herein.

### 57. American with Disabilities Act:

Any other provision of this Lease notwithstanding, the parties hereby agree that the demised premises may be subject to the terms and conditions of the Americans with Disabilities Act of 1990 (hereinafter the "ADA"). The parties further agree and acknowledge that it shall be the sole responsibility of the Lessee to comply with any and all provisions of the ADA, as such compliance may be required to operate the demised premises. The Lessee further agrees to indemnify and hold the Lessor harmless against any claims which may arise out of Lessee's failure to comply with the ADA. Such indemnification shall include, but not necessarily be limited to reasonable attorney's fees, court costs and judgments as a result of said claims.

### 58. Hazardous Waste Clause:

a) Lessee, at its expense, shall comply with all applicable laws, regulations, rules and orders relating to Lessee's particular use of the premises, regardless of when they become or became effective, including, without limitation, those relating to health, safety, noise, environmental protection, waste disposal, and water and air quality, and furnish satisfactory evidence of such compliance upon request of Lessor, provided, however that Lessee shall not be responsible for violations predating Lessee's occupancy of the premises or violation relating to the physical condition of the premises unless such violations or physical conditions are causes by the act or omission of Lessee, its employees, agents, invitees, contractors, subcontractors, or their employees or agents.

b) Should any discharge, leakage, spillage, emission, or pollution of any type occur upon or from the premises proximately caused by Lessee and not caused by any act of Lessor or other Lessee or third party, Lessee, at its expense shall be obligated to clean all the property affected thereby, whether owned or controlled by Lessor or any third person, to the reasonable satisfaction of Lessor (insofar as the property owned or controlled by Lessor is concerned) and to the satisfaction of any governmental body having jurisdiction thereover.

c) Lessee shall indemnify, hold harmless and defend Lessor against all liability, cost and expense (including without limitation any fines, penalties, judgments, litigation costs and reasonable attorney's fees) incurred by lessor as a proximate result of Lessee's breach of this section, or as a proximate result of any such discharge, leakage, spillage, emission or pollution, regardless of whether such liability cost or expense arises during or after the term, provided, however, that such discharge, leakage, spillage, emission or pollution is proximately caused by Lessee; and provided further that if such liability cost or expense is proximately causes solely by the active negligence of Lessor then Lessor shall be solely liable therefor.

d) Lessee shall pay all amounts due Lessor under this paragraph; as additional rent, within thirty (30) days after receipt of notice from Lessor.



59. **Condition of Premises:**

Lessor to deliver space to Lessee in an "as-is" condition with no additional improvements.

60. **Outside Work and Storage:**

At NO TIME shall Lessee be permitted to conduct work activities (except for normal loading and unloading of vehicles) nor store goods or materials of any kind outside the confines of said premises.

61. **Garbage/Pallets:**

Lessee, at Lessee's expense, shall be responsible for Lessee's garbage bins(s). Lessee's garbage bin(s) shall be stored outside Lessee's Unit. Lessee shall not store wooden pallets outside of the warehouse space.

62. **Rents:**

| Months | Rate/Month |
|--------|------------|
| 01 – 12 | $10,000.00 |
| 13 – 24 | $10,400.00 |

63. **CC & R's:**

Lessee shall comply with all rules and regulations within Foothills Commerce Center CC & R's throughout the Lease term and extensions.

This Agreement has been prepared for submission to your attorney for his approval. No representation or recommendation is made by the real estate Broker(s) or their agents or employees as to the legal sufficiency, legal, effects, or tax consequences of this Agreement or the transaction involved herein.

AGREED AND ACCEPTED

LESSOR:

Bianchi Estates LLC
Print Name

By: _____
        Paul J. Bianchi Jr.

Date: 7/ u / 1 0

LESSEE:

Speed Technologies LLC.
Print Name

By: _____

Date: 6 | 18 | 10



# AMENDMENT TO LEASE

**# 1**

THIS AMENDMENT TO LEASE is made and entered into as of ___April 10, 2012_____ , by and between
_Bianchi Estates LLC_____ ("Lessor")
and _Speed Technologies, LLC_____ ("Lessee").

WHEREAS, on or about _May 25, 2010_____ a Lease was entered into by and between Lessor and Lessee relating
to certain real property commonly known as: _9716 S. Virginia Street, Suite 100_____
(the "Premises"), and

WHEREAS, Lessor and Lessee ☐ have ☑ have not previously amended said Lease, and

WHEREAS, the Lessor and Lessee now desire to amend said Lease.

~~NOW, THEREFORE, for payment of TEN DOLLARS and other good and valuable consideration to Lessor, the receipt and sufficiency~~
~~of which is hereby acknowledged, the parties mutually agree to make the following additions and modifications to the Lease:~~

☑     TERM: The Expiration Date is hereby ☐ advanced ☑ extended to _June 30, 2014_____ .

☐     AGREED USE: The Agreed Use is hereby modified to: _____
_____

☑     BASE RENT ADJUSTMENT: Monthly Base Rent shall be as follows: _Month 25-36 $10,400 and Month 37-48_
_$10,816_____
_____
_____
_____

☐     OTHER: _____
_____
_____
_____

This Agreement shall not be construed against the party preparing it, but shall be construed as if all parties jointly prepared this
Agreement and any uncertainty and ambiguity shall not be interpreted against any one party.

All other terms and conditions of this Lease shall remain unchanged and shall continue in full force and effect except as specifically
amended herein.

EXECUTED as of the day and year first above written.

| By Lessor: | By Lessee: |
|---|---|
| Bianchi Estates LLC | Speed Technologies LLC |
| PO Box 2455, Rocklin Ca 95677 | 9716 S.Virginia Street, Ste 100 |
| By: | By: |
| Name Printed: Paul J. Bianchi Jr | Name Printed: John Harrah |
| Title: Principal | Title: Owner |
| By: | By: |
| Name Printed: | Name Printed: |
| Title: | Title: |

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you
are utilizing the most current form: AIR Commercial Real Estate Association, 800 W 6th Street, Suite 800, Los Angeles, CA 90017.
Telephone No.: (213) 687-8777.  Fax No.: (213) 687-8616.

INITIALS                                                                                      INITIALS

©2006 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                              FORM ATL-0-7/06E

## AMENDMENT #2
### TO THAT CERTAIN LEASE DATED MAY 25, 2010 AND ITS ASSOCIATED
### AMENDMENT #1 DATED APRIL 10, 2012,
### BY AND BETWEEN
### BIANCHI ESTATES, LLC, "LESSOR"
### AND
### SPEED TECHNOLOGIES, LLC, "LESSEE"

THIS AMENDMENT #2 (this "AMENDMENT"), dated as of January 11, 2013 is made to the Standard Industrial/Commercial Multi-Tenant Lease - Gross, dated May 25, 2010, and its associated Amendment #1 dated April 10, 2012, by and between Bianchi Estates LLC , as Lessor, and Speed Technologies LLC, as Lessee, for the premises commonly known as 9716 S. Virginia Street, Suite 100 (±12,507 SF), and approx. 10,000 SF of yard area, located in Reno, Nevada.

NOW, THEREFORE, in consideration of the mutual promises hereinafter made, and for good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto hereby modify, amend and/or supplement the Lease as follows:

1. **Section 1.5, Rent.**

   | Rent Period: | Monthly Rent: |
   | --- | --- |
   | January 1, 2013 | $7,000.00 |
   | February 1, 2013 | $7,000.00 |
   | March 1, 2013 | $7,000.00 |
   | April 1, 2013 | $13,800.00 |
   | May 1, 2013 | $13,800.00 |
   | June 1, 2013 | $13,800.00 |
   | July 1, 2013 – June 2014 | $10,816.00 |

All other terms and conditions shall remain the same.

**This Amendment has been prepared for submission to your attorney for his approval. No representation or recommendation is made by the real estate Broker(s) or their agents or employees as to the legal sufficiency, legal effect, or tax consequences of this Amendment or the transaction involved herein.**

**AGREED AND ACCEPTED**

LESSOR:

BIANCHI ESTATES, LLC

By: _____
    Paul J. Bianchi, Jr., Managing Member

Date: _4/17/13_

LESSEE:

SPEED TECHNOLOGIES LLC

By: _____
    John Harrah

Date: _4/17/13_

# Exhibit  2

# Exhibit  2

IN THE JUSTICE COURT OF RENO TOWNSHIP, IN AND FOR THE
COUNTY OF WASHOE, STATE OF NEVADA

FILED

14 MAY 27 AM 9: 22

STEVE TUTTLE
RENO JUSTICE COURT
BY _____
DEPUTY

**BIANCHI ESTATES, LLC**
Landlord (s) / Complex Name
**P.O. BOX 2455 ROCKLIN CA**
Landlord (s) Address
**SPEED TECHNOLOGIES, LLC**
Tenant
**9716 S. VIRGINIA STREET #100**
Tenant (s) Address
**RENO , NV 89511**

#5

Case No: **REV 2014-000880**

| CALL NEVADA COURT SERVICES FOR THE |
| LOCKOUT  -  (775) 348-7560 |

STATE OF NEVADA           )
                          )    SS.
COUNTY OF WASHOE          )

AFFIDAVIT   NON-PAYMENT

The undersigned petitioner, being first duly sworn, deposes and says:

1.  That your affiant is the landlord of certain dwellings or apartments within the jurisdictional confines of Reno Township, Washoe County, Nevada.

2.  That your affiant rented a certain dwelling or apartment to **SPEED TECHNOLOGIES, LLC**, located at **9716 S VIRGINIA ST #100 RENO,NV**, on **2/2011**, with periodic rental payments reserved by the month or for a shorter period of time.

    (a) Cleaning or rental deposit paid in advance **$0.00** in excess of the first month's rent.
    (b) Date rental payment delinquent **5/5/14**
    (c) Length of time without paying rent **21 DAYS**
    (d) Date rent due **ON THE FIRST OF THE MONTH**
    (e) Amount of rent due $ **16,224.00**

3.  That the periodic rental payments have not been waived or altered by written agreement of any kind.

4.  That the above named tenant is in the arrears on rent and that notice has been served on the tenant in accordance with the provisions of Nevada Revised Statutes, Chapter 40, as amended, a copy of which said Notice is attached hereto and incorporated herein.

5.  That more than five judicial days have elapsed since the service of the Notice of Eviction as aforesaid, namely; **XXX**In person on **5/14/14**, OR _____ Mailing on _____, AND _____ Posted on _____, but they above named tenant has refused, and still refuses, to vacate and quit the above named premises.

    WHEREFORE, your affiant prays for and order of this Court, directed to the Sheriff or Constable of Washoe County, ordering the above named tenant from the above-mentioned premises, as provided in Nevada Revised Statutes, Chapter 40.

_____
PETITIONER

SUBSCRIBED and SWORN to before me this **27TH** day of _____**MAY**_____, 20 **14**

REV2014-000880
AOL
Affidavit of Landlord for Non Payment of R
245128

_____
NOTARY PUBLIC

H.B. CEDOMIO
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 05-100895-2 - Expires February 8, 2016

IN THE RENO TOWNSHIP JUSTICE COURT OF THE STATE OF NEVADA
IN AND FOR THE COUNTY OF WASHOE

*FILED*
*2014 JUN -2 AM 9: 07*
*STEVE TUTTLE*
*RENO JUSTICE COURT*
*BY _____*
*DEPUTY*

| | | |
|---|---|---|
| Bianchi Estates LLC | ) | Dated: 5/28/2014 |
| PLAINTIFF | ) | |
| | ) | Civil File Number: 14005673 |
| Vs | ) | |
| | ) | CASE No.: REV2014000880 |
| Speed Technologies LLC | ) | |
| DEFENDANT | ) | |

## DECLARATION OF SERVICE

STATE OF NEVADA     }
                } ss:
COUNTY OF WASHOE   }

     George Rutter, being first duly sworn, deposes and says: That affiant is a citizen of the United States, over 18 years of age, not a party to the within entered action, and that in the County of Washoe, State of Nevada, personally served the described documents upon:

| | |
|---|---|
| Posted: | Speed Technologies LLC |
| Location: | 9716 S Virginia Street #100 Reno, NV 89511 |
| Date: | 5/28/2014     Time:    10:10 AM |

The document(s) served were: EVICTION ORDER

I declare under penalty of perjury under the law provided of the State of Nevada that the foregoing is true and correct. No notary is required per NRS 53.045.

               MICHAEL HALEY, SHERIFF

               By: *G. Rutter 1069*
                     Sheriff's Authorized Agent

Nevada Court Services
475 S. Arlington Ave
Suite #1A
Reno, NV 89501

REV2014-000880
DS
Declaration of Service
247113

911 PARR BOULEVARD, RENO, NV 89512-1000 (775) 328-3310

# Exhibit 3

# Exhibit 3

FILED

14 MAY 27 PM 12: 52

STEVE TUTTLE
RENO JUSTICE COURT
BY D. Smith
DEPUTY



## IN THE JUSTICE'S COURT OF RENO TOWNSHIP
## COUNTY OF WASHOE, STATE OF NEVADA

Bianchi Estates, LLC

                  Landlord

vs.

Speed Technologies, LLC

                  Tenant

_____/

Case No. REV2014-000880
Department 5

**LOCKOUT ORDER**

UPON APPLICATION duly and regularly made by **Bianchi Estates, LLC**, Landlord, and proof thereon being supported by a sworn affidavit on the date hereinafter mentioned, and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

That the Sheriff of Washoe County, or one of their duly authorized agent, are hereby directed to remove each and every person found upon and within those certain premises located at **9716 S Virginia St Apt 100 Reno Nv 89511**, Reno Washoe County, Nevada within 24 hours after receipt of this order.

DATED: May 27, 2014.

_____

JUSTICE OF THE PEACE

REV2014-000880
EO
Eviction Order Filed
245284

# Exhibit  4

# Exhibit  4

12:36 PM
08/10/14
Accrual Basis

**Bianchi Estates LLC**
**Speed Techology Costs**

| Type | Date | Num | Source Name | Memo | Amount | Balance |
|------|------|-----|-------------|------|--------|---------|
| **Late Fee Income** | | | | | | |
| Invoice | 11/01/2013 | 4556 | Speed Technologies, LLC | Balance of Late fee for rent not received by due date for month of November 2013 | 76.80 | 76.80 |
| Invoice | 02/01/2014 | 4698 | Speed Technologies, LLC | Late fee for rent not received by due date for month of February 2014 | 1,081.60 | 1,158.40 |
| Invoice | 03/07/2014 | 4792 | Speed Technologies, LLC | Late fee for rent not received by due date for month of March 2014 | 1,081.60 | 2,240.00 |
| Invoice | 04/06/2014 | 5005 | Speed Technologies, LLC | Late fee for rent not received by due date for month of April 2014 | 1,081.60 | 3,321.60 |
| Invoice | 05/01/2014 | 4825 | Speed Technologies, LLC | Charge for returned check | 35.00 | 3,356.60 |
| Invoice | 05/06/2014 | 4852 | Speed Technologies, LLC | Late fee for rent not received by due date for month of May 2014 | 1,081.60 | 4,438.20 |
| Invoice | 06/06/2014 | 4957 | Speed Technologies, LLC | Late fee for rent not received by due date for month of June 2014 | 1,081.60 | 5,519.80 |
| Invoice | 07/06/2014 | 4959 | Speed Technologies, LLC | | 0.00 | 5,519.80 |
| **Total Late Fee Income** | | | | | 5,519.80 | 5,519.80 |
| | | | | | | |
| **Rental Income** | | | | | | |
| Invoice | 05/01/2014 | 4825 | Speed Technologies, LLC | Monthly Unit Rent | 10,816.00 | 10,816.00 |
| Invoice | 06/01/2014 | 4892 | Speed Technologies, LLC | Monthly Unit Rent | 10,816.00 | 21,632.00 |
| Invoice | 07/01/2014 | 4958 | Speed Technologies, LLC | Monthly Unit Rent | 11,300.00 | 32,932.00 |
| Invoice | 08/01/2014 | 4999 | Speed Technologies, LLC | Monthly Unit Rent | 11,300.00 | 44,232.00 |
| Invoice | 09/01/2014 | | Speed Technologies, LLC | Monthly Unit Rent | 11,300.00 | 55,532.00 |
| Invoice | 10/01/2014 | | Speed Technologies, LLC | Monthly Unit Rent | 11,300.00 | 66,832.00 |
| **Total Rental Income** | | | | | 66,832.00 | 66,832.00 |
| | | | | | | |
| **Interest** | | | | | | |
| Credit Card Charge | 07/17/2014 | | Washoe County Treasurer | Cash advance and interest fees imposed by Capital One | 209.51 | 209.51 |
| **Total Interest** | | | | | 209.51 | 209.51 |
| | | | | | | |
| **Auto / Fuel expense** | | | | | | |
| Check | 06/10/2014 | | Dawson Oil Company | Travel Fuel Expense | 92.39 | 92.39 |
| Check | 06/24/2014 | | Dawson Oil Company | Travel Fuel Expense | 92.56 | 184.95 |
| Check | 07/16/2014 | | Dawson Oil Company | Travel Fuel Expense | 58.65 | 243.60 |
| Credit Card Charge | 07/19/2014 | | Shell | Travel Fuel Expense | 44.02 | 287.62 |
| Check | 07/19/2014 | | Dawson Oil Company | Travel Fuel Expense | 68.34 | 355.96 |
| Check | 07/22/2014 | | Dawson Oil Company | Travel Fuel Expense | 87.05 | 443.01 |
| Check | 07/30/2014 | | Dawson Oil Company | Travel Fuel Expense | 36.74 | 479.75 |
| Check | 07/31/2014 | | Hunt & Sons | Travel Fuel Expense | 84.99 | 564.74 |
| **Total Auto / Fuel** | | | | | 564.74 | 564.74 |

12:36 PM
08/10/14
Accrual Basis

**Bianchi Estates LLC**
**Speed Techology Costs**

| | Type | Date | Num | Source Name | Memo | Amount | Balance |
|---|---|---|---|---|---|---|---|
| **Legal Fees** | | | | | | | |
| | Credit Card Charge | 05/27/2014 | | Nevada Court Services | Judicial Process and Premises Civil Stanby | 293.00 | 293.00 |
| | Check | 06/13/2014 | 29638 | Nevada Court Services | Judicial Process and Premises Civil Stanby | 240.00 | 533.00 |
| | Check | 06/20/2014 | 29641 | Nevada Court Services | Judicial Process and Premises Civil Stanby | 1,485.00 | 2,018.00 |
| | Check | 06/27/2014 | 29689 | Nevada Court Services | Judicial Process and Premises Civil Stanby | 1,560.00 | 3,578.00 |
| | Check | 06/30/2014 | June 14 Speed Tech | Donald Harmata | Payment for legal services provided for Speed Tech issue. | 11,746.45 | 15,324.45 |
| | Check | 07/21/2014 | 29854 | Nevada Court Services | Judicial Process and Premises Civil Stanby | 1,337.50 | 16,661.95 |
| | Credit Card Charge | 07/24/2014 | MALIKOWSKI | Paul Malikowski | Payment for legal services provided for Speed Tech issue. | 7,500.00 | 24,161.95 |
| | Check | 07/25/2014 | 29857 | Nevada Court Services | Judicial Process and Premises Civil Stanby | 665.00 | 24,826.95 |
| | Check | 07/30/2014 | July 2014 | Donald Harmata | Payment for legal services provided for Speed Tech issue. | 13,736.25 | 38,563.20 |
| | Check | 08/01/2014 | 29922 | Nevada Court Services | Judicial Process and Premises Civil Stanby | 600.00 | 39,163.20 |
| | Bill | 08/08/2014 | BarNone | Bar None Auction | Minimum Auctioneer Fee | 15,000.00 | 54,163.20 |
| | Credit Card Charge | 08/04/2014 | 2000038268 | Reno Gazette | Legal Notice of Public Sale | 170.00 | 54,333.20 |
| **Total Legal Fees** | | | | | | 54,333.20 | 54,333.20 |
| | | | | | | | |
| **Meals and Entertainment** | | | | | | | |
| | Credit Card Charge | 06/19/2014 | | Pegs Glorified Ham & Eggs | Meals in Reno; schedule appointments for property pickup | 60.47 | 60.47 |
| | Credit Card Charge | 07/19/2014 | | NuYalk Pizza | Meals in Reno; schedule appointments for property pickup | 39.91 | 100.38 |
| | Credit Card Charge | 07/22/2014 | | Rapscallion | Meals in Reno; schedule appointments for property pickup (J Barritt, R Rosales, L Bianchi) | 92.09 | 192.47 |
| | Credit Card Charge | 07/31/2014 | | NuYalk Pizza | Meals in Reno; schedule appointments for property pickup | 31.19 | 223.66 |
| | Credit Card Charge | 08/06/2014 | | Rapscallion | Meals in Reno; Paul Malikowski | 30.86 | 254.52 |
| **Total Meals and Entertainment** | | | | | | 254.52 | 254.52 |
| | | | | | | | |
| **Miscellaneous** | | | | | | | |
| | Credit Card Charge | 07/17/2014 | | Washoe County Treasurer | Speed Tech - past due Personal Property taxes due to Washoe County Treasure | 10,825.90 | 10,825.90 |
| **Total Miscellaneous** | | | | | | 10,825.90 | 10,825.90 |
| | | | | | | | |
| **Postage and Delivery** | | | | | | | |
| | Stamps.com | 06/17/2014 | | US Postage | To Speed Technologies/John Harrah (Certified Mail) | 6.48 | 6.48 |
| | Credit Card Charge | 07/06/2014 | | FedEx | To Speed Technologies/John Harrah | 26.20 | 32.68 |
| **Total Postage and Delivery** | | | | | | 32.68 | 32.68 |
| | | | | | | | |
| **Professional Fees** | | | | | | | |
| | Check | 06/11/2014 | 5201 | Rick Fuller | Consultant Services (06/11/2014) | 110.00 | 110.00 |

12:36 PM
08/10/14
Accrual Basis

**Bianchi Estates LLC**
**Speed Techology Costs**

| | Type | Date | Num | Source Name | Memo | Amount | Balance |
|---|---|---|---|---|---|---|---|
| | Bill | 08/01/2014 | | John Barritt | Consultant Services (07/17/2014, 07/19/2014, 07/24/2014, 07/31/2014) | 4,400.00 | 4,510.00 |
| | Bill | 07/30/2014 | | Ranulfo Rosales | Consultant Services (05/28/2014 - 08/07/2014) | 2,320.00 | 6,830.00 |
| | Bill | 05/28/2014 | | Lucienne Bianchi | Management Services Provided: from 05/28/2014 Thru 08/08/2014 | 6,850.00 | 13,680.00 |
| | Check | 08/06/2014 | 5210 | Dan Mulhall | Consultant Services (07/22/2014, 07/23/2014, 07/24/2014) | 200.00 | 13,880.00 |
| | Check | 08/07/2014 | 5206 | Dan Mulhall | Consultant Services (07/17/2014, 07/19/2014) | 376.00 | 14,256.00 |
| Total Professional Fees | | | | | | 14,256.00 | 14,256.00 |
| | | | | | | | |
| **Rent Expense** | | | | | | | |
| | Bill | 07/19/2014 | 114530 | Cal-Nevada Towing | Warehouse Storage and Vehicles Moved Outside Storage | 35,657.50 | 35,657.50 |
| Total Rent Expense | | | | | | 35,657.50 | 35,657.50 |
| | | | | | | | |
| **Repairs and Maintenance** | | | | | | | |
| | Credit Card Charge | 07/28/2014 | | Home Depot | Padlock | 24.75 | 24.75 |
| | Credit Card Charge | 07/19/2014 | | Home Depot | Padlock | 24.75 | 49.50 |
| | Credit Card Charge | 07/21/2014 | | The Lock & Glass Shop, Inc. | Change locks for court ordered lockout | 162.56 | 212.06 |
| | Credit Card Charge | 08/07/2014 | | The Lock & Glass Shop, Inc. | Change locks for vans/haulers | 192.38 | 404.44 |
| Total Repairs and Maintenance | | | | | | 404.44 | 404.44 |
| | | | | | | | |
| **Security** | | | | | | | |
| | Check | 06/06/2014 | 18512 | ABC Fire & Cylinder Service | Alarm Installation | 606.67 | 606.67 |
| | Check | 06/11/2014 | 107988 | ABC Fire & Cylinder Service | Camera Labor/Service | 110.00 | 716.67 |
| | Check | 07/01/2014 | IN00022198 | ABC Fire & Cylinder Service | Monthly alarm monitoring | 60.00 | 776.67 |
| | Bill | 08/01/2014 | | ABC Fire & Cylinder Service | Monthly alarm monitoring | 60.00 | 836.67 |
| | Bill | 09/01/2014 | | ABC Fire & Cylinder Service | Monthly alarm monitoring | 60.00 | 896.67 |
| | Bill | 10/01/2014 | | ABC Fire & Cylinder Service | Monthly alarm monitoring | 60.00 | 956.67 |
| | Check | 08/06/2014 | 5209 | City of Reno - Alarm | Registration Alarm Fee - business | 25.00 | 981.67 |
| Total Security | | | | | | 981.67 | 981.67 |
| | | | | | | | |
| **Utilities** | | | | | | | |
| **Gas & Electric** | | | | | | | |
| | Check / EFT | 06/17/2014 | 060514-061214 | NV Energy | Electricity and Gas  06/05/14  THRU 06/12/14 | 139.91 | 139.91 |
| | Check / EFT | 07/16/2014 | 061214-071114 | NV Energy | Electricity and Gas  06/12/14  THRU 07/11/14 | 309.77 | 449.68 |
| Total Gas & Electric | | | | | | 449.68 | 449.68 |

12:36 PM
08/10/14
Accrual Basis

**Bianchi Estates LLC**
**Speed Techology Costs**

| Type | Date | Num | Source Name | Memo | Amount | Balance |
|------|------|-----|-------------|------|--------|---------|
| Total Utilities | | | | | 449.68 | 449.68 |
| **TOTAL** | | | | | 190,321.64 | 190,321.64 |

# Exhibit  5

# Exhibit  5

## PHONE CALL

FOR _me_
M _Brian Mcgee_
OF
PHONE _775-745-1798_    CELL
MESSAGE _His property w/ Speed._
_Tech he needs to get_

- [ ] TELEPHONED
- [ ] RETURNED YOUR CALL
- [ ] PLEASE CALL
- [ ] WILL CALL AGAIN
- [ ] CAME TO SEE YOU
- [ ] WANTS TO SEE YOU

SIGNED

DATE _8/20/14_  TIME _10 32_ A.M.

---

## PHONE CALL

FOR _me_
M _Joseph Bitty_
OF
PHONE _775-881-8219_    CELL
MESSAGE _Needs to get his_
_Stuff from Speed Technologies_

- [ ] TELEPHONED
- [ ] RETURNED YOUR CALL
- [ ] PLEASE CALL
- [ ] WILL CALL AGAIN
- [ ] CAME TO SEE YOU
- [ ] WANTS TO SEE YOU

SIGNED

DATE _8/20/14_  TIME _11 00_ A.M. P.M.

---

## IONE CALL

FOR _me_
M _John Cash_
OF
PHONE _775-241-2198_    CELL _720-6567_
MESSAGE
_Has Equipment @ 1/14_
_Speed Technologies WH_
_Injued Back_

- [ ] TELEPHONED
- [ ] RETURNED YOUR CALL
- [ ] PLEASE CALL
- [ ] WILL CALL AGAIN

DATE _8/21/14_  TIME _10 34_ A.M. P.M.

---

## PHONE CALL

FOR _me_
M _Gene Beaudreau_
OF                    _WH_
PHONE _(510) 351-7595_    CELL
MESSAGE _Re Speed Technology_
_- was sch to Pick up_
_his Equipment today @_
_3 00 needs to Know When_
_he can get some_

- [ ] TELEPHONED
- [ ] RETURNED YOUR CALL
- [ ] PLEASE CALL
- [ ] WILL CALL AGAIN
- [ ] CAME TO SEE YOU
- [ ] WANTS TO SEE YOU

SIGNED

DATE _8/20/14_  TIME _9 30_ A.M. P.M.

In regards to the Indemnification agreement I BJ Joseph Ritter am hereby describing my personal items and tools at Speed Technologies at 9716 S.Virginia St. Reno, NV.

1 red tool cart (older looking, not in newer condition) with tools in the top and bottom of cart as well as the small drawers attached to the side of the cart.

Tool description of tools on, under and inside of cart.  Almost all of my tools are marked with an '11' symbol either with a marker or engraved, mainly on my cases or end of the wrench handles.  Very easily identified (the '11' is my personal symbol number, as I I was born on Oct. 11 (I also have a tattoo of this on the inside of my arm/bicep.  On the bottom of the tool cart should be all my red Snap-On tools hammers, a small blue box(with '11') with sockets wrench fittings inside, among many other personal tools.  On the top of the box should still be a chrome magnetic bar with my red Snap-On Socket wrenches of various sizes along with all my size gauge trays holding my sockets.  On the back of the cart will be a screw driver holder with red Snap-on screw drivers (marked with my logo).  Long chrome Matco breaker bar (1/2") Snap on small air hose,  snap on air grinder bits in red box,(all of this should be safe and sound still last I heard in my work bay inside my tool cart either on the top or bottom of my cart.

One Snap on Drop Light (should be on top of the tool cart or next to it.

One black bag with yellow draw strings with a Red welding helmet with flames on the helmet and sheep skin forehead protector on the welding hold helmet straps.

1 top and bottom black tool box with '11' logo written on it with green paint pen (tool box is mainly empty due to most of my tools being in my tool cart. (my tool cart and black tool box were next to each other in my work bay).

I also have tools inside my race tool box which has my name BJ on the front of the box, again this should be next to my cart in my bay where it was last I left it.  Red Snap on ½" drive socket wrench(long) Chrome Torque wrenches x 2 ½" and 3/8".  A'N wrenches all describable and soldering iron

One aluminum motorcycle stand with black rubber top and a large hole in the center for changing oil on dirtbikes.

One matching aluminum dirt bike ramp (which stand and ramp should be all next to my cart in my bay, which is the 5th bay down from the front of the building.

One red MatCo folding creeper/chair
One chrome 10" golf cart wheel brought in For Mock-up For a Tool cart that was being built.

ON the bottom of the work table in my bay is a black pair of tennis shoes (vans, size 12, which I can care a less about, just trying to better describe things that show where my bay is. Thank you so much, Sincerely, BJ Joseph Ritter

CLAIMS BY TONY HEWES.

A. **Claimed Property In Which He Has A Sole Ownership Interest**

This list is compiled from Mr. Hewes' memory as he has not had access to the property to complete a fuller inventory and he reserves the right to properly claim additional personal property at or about the time access and full inventory will be permitted.

One (1) Snap On 70th anniversary tool box with top box and all contents

One (1) Snap On cam bearing tool with all attachments

One (1) Snap On tool box with machine tools end mills and all contents

One (1) ABS ring grinder

One (1) Piston vise with attachments and cutters

One (1) 90 degree machine block with no holes

One (1) 90 degree machine block with slots

One (1) Rotary table (for milling machine)

Four (4) 4-shelf carts (from Grainger) with wheels

One (1) Comp Cams "CC" kit

One (1) 12" height micrometer with base (on the granite block)

One (1) 2" travel dial indicator with base (on the granite block)

One (1) box set Sunnen Valve Guide Dial Bore Gauge with 4 probes

One (1) 10' blue wood bench with steel top used for engine assembly with all assembly fluids and greases on top.

One (1) 6' blue wood work bench with steel top

One (1) Craftsman "Top" tool box (on top of 6' blue bench)

One (1) 429 Ford NHRA stock eliminator engine complete (crank in block, additional parts on 1 grey 4-shelf cart)

One (1) 428 Ford NHRA super stock engine complete (short block assembled, additional parts on 1 grey shelf and heads disassembled on 6' blue bench)

One (1)  Blue Point ring compressor with all attachments

Four (4) Non- adjustable Tapered ring compressors

One (1)  Pallet with at least 4 bellhousings and at least 5 sets of headers (1 FE ford, 1 small block chevrolet, 1 Big block chevrolet, 1 small block Ford, 1 289 race headers)

One (1)  Dewalt abrasive cutoff saw

One (1)  Horizontal band saw

One (1)  Miller "Sincrowave" tig welder with adjacent welding bench and all welding rod

Two (2) stationary stools

One (1)  Snap On tools red "roll around" mechanics stool

One (1)  429 Ford handmade by Hewes "travel engine stand"

One (1)  428 Ford handmade by Hewes "travel engine stand"

Four (4) At least 4  "assembly" engine stands

Two (2) silicone caulking guns

One (1)  pallet of aluminum material and all aluminum material leaning against wall behind pallet.

Four (4) (At least 4) small drawer cabinets with misc specialty engine fasteners, etc

One (1)  Large Bolt bin with USS bolts included

One (1)  Large Bolt bin with freeze plugs in it and bolted to a grey cabinet with misc engine small parts

One (1) Wood cabinet next to my desk with two catalog racks on top of it which catalogs and racks are mine

One (1) Computer and monitor at my desk

One (1) Wooden shelf with industry catalogs in it and the industry catalogs are mine

One (1) 5 drawer five cabinet with previous Hewes Performance Machine files in it

Six (6) (At least 6) cardboard file folder boxes next to and behind the steel file cabinet

One (1)  wooden shelf with textbooks etc in it, (next to wooden cabinet next to desk)

All contents in and on top of my desk (calculator, stapler etc)

Four (4) (At least 4) orange air hoses

Three (3) work order holders behind desk

One (1) "L" shaped steel top counter in front of side door

One (1) 16' blue shelf next to side door (left side as you walk in)

One (1) "Long" drill bit set (On bench next to crankshaft balancer)

One (1) Craftsman roll around tool box that the valve grinder is on top of

Two (2) Steel cabinets, 2 open cabinets (on south wall next to 6' blue bench)

One (1) "T" handle allen wrench set (on rod heater bench)

One (1) 4' x 8' blue bench in teardown area

Two (2) 390 ford torque plates

Two (2) 302 Ford torque plates

One (1)  460 Ford Torque plate

One (1)  Oxy-Acetylene torch set up with bottles and cart

One (1)  Miller "Auto Darkening" welding helmet

One (1)  Another Welding helmet

Two (2) Pairs welding gloves

One (1)  Remac valve spring tester

One (1)  Electric Magnaflux Kit

**From:** Michael Lehners <michaellehners@yahoo.com>
**To:** Mike Lehners <mcl3303@aol.com>
**Subject:** Fw: 427 Ford Cylinder head
**Date:** Mon, Aug 25, 2014 10:19 am
**Attachments:** 100_0450.jpg (4167K), 100_0451.jpg (3859K), 100_0452.jpg (3831K), 100_0453.jpg (4325K)

--- On Mon, 8/25/14, jcash8888@aol.com <jcash8888@aol.com> wrote:

> From: jcash8888@aol.com <jcash8888@aol.com>
> Subject: 427 Ford Cylinder head
> To: MichaelLehners@yahoo.com
> Date: Monday, August 25, 2014, 10:14 AM
>
>
>
> Mr.
> Lehners
>
>
>
> Last April I drop
> off one cylinder head at Speed
> Technologies (Tony Hewes) that needed to be welded inside of
> the combustion
> chamber. This cylinder head is for a 427 Ford and is known
> as a tunnel port
> head (oval intake runners shown in the attached photos and
> rectangular exhaust
> runners). I used too long of exhaust manifold bolt which
> created a three quarter
> round crack inside of the combustion chamber opposite the
> bottom manifold bolt
> hole on one of the outside combustion chamber. The only
> other markings on the
> cylinder would be a letter L stamped on top of mounting
> pedestal for the rocker
> arm shaft.  This head is not
> a common
> head for this particular make engine. One other thing Tony
> wrote down my phone
> numbers on the cylinder head 775 241 2198 and 720 6567.
>
> Estimated replacement
> value $3,500.
>
>
>
> Please find the attached pictures of
> the matching head.
>
>
>
>
>
>
>
> John
> Cash
>
> 16
> Lemon Road
>

```
>
>
>
> Carson
> City, Nevada
>
>
>
> 89706
>
>
>
> Home
> phone 775 241 2198
>
>
>
```

4 Attached Images









**Batteux**
Racing & Machine
*Jean Batteux*
555 Estabrook Street
San Leandro CA 94577
Phone  (510) 351-7594

To  MICHEL LEHNERS
Attention  DELORES
Fax No.  775-786-0799
Date  22 AUG 14
Subject  PARTS AT SPEED TECH.

1 - ALUM FORD A-R RACE BLOCK

2 - 20 HEAD STUDS (19 LONG & 1 SHORT)
        FOR BLOCK

3 - BHJ HONING PLATE FOR RACE BLOCK

4 - 1 SET NEW CROWER RODS
        PART # B93911B-8

    THESE ARE THE PARTS I OWN

        THANKS
        J Batteux